COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

RICARDO CORIA,                                              )

                                                                              )              
No.  08-04-00233-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )               
205th District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )              
(TC# 20030D05373)

                                                                              )

 

 

O
P I N I O N

 

Ricardo Coria
appeals his jury conviction for possession of marijuana, 2,000 pounds or less
but more than 50 pounds, enhanced by a prior felony conviction for engaging in
organized criminal activity.  The trial
court assessed punishment at 35 years imprisonment.  Appellant raises two issues on appeal:  (1) whether the evidence was legally
insufficient to support his conviction; and (2) whether the trial court erred
in allowing the State to seek an enhancement punishment because the State
failed to provide timely notice of intent to seek an enhanced punishment.  We affirm.

 








In February 2003,
El Paso Police Officer Rick Jordan observed a white panel van driving
recklessly on Highway 54, weaving in and out of traffic, cutting off other
vehicles, before it exited the freeway. 
The van sped through a residential area and did not respond to Officer
Jordan=s attempt
to perform a traffic stop by activating his sirens and lights.  Officer Jordan continued to pursue the van
until it eventually stopped at a dead-end. 
Although it was dark, there was enough light in the area for Officer
Jordan to observe the driver exit from the left and two Hispanic male
passengers exit from the sliding passenger door on the right of the van.  The driver began running eastbound toward
Fort Bliss and Officer Jordan chased him on foot.  The driver turned and raised what appeared to
be a weapon and in response, Officer Jordan pulled his weapon and fired at
him.  The driver then continued running
northbound through the desert and the officer continued to chase him, firing
another shot when the driver spun around a second time.  The driver then went down an arroyo, and the
officer lost sight of him.

As Officer Jordan
made his way back to the residential area where the van had stopped, he noticed
a Border Patrol truck at the scene.  The
Border Patrol agent told Officer Jordan that he had heard the gunfire and came
back to make sure that he was okay.[1]  The agent told Officer Jordan that the van
was Aloaded.@ 
At first, Officer Jordan did not understand what the agent meant, until
he approached the van and looked into the open right side door and open driver=s side door to see several large
bundles, which he believed to contain illegal drugs, inside the van.








When other
responding police units arrived at the scene, Officer Jordan gave a description
of the men he had seen fleeing the van and the other officers began canvassing
the area.  Officer Jordan described the
driver as a Hispanic male, heavyset, wearing a hooded blue sweatshirt, and
jeans.  Officers Jesus Sanchez and
Clinton Nelms were among the officers involved in canvassing the area for the
suspects.  Officer Sanchez recalled that
they went house to house, looking in backyards and vehicles in their search
based on Officer Jordan=s
description of the suspect as a Amale
subject with dark clothing.@  Officer Nelms testified that the suspects
were described as A[a]ll
Hispanic males wearing dark clothing@
and that the suspect Officer Jordan had chased on foot was wearing a hooded
sweatshirt.

Approximately one
hour later, Officers Sanchez and Nelms spotted Appellant about four to six
blocks away from the abandoned van. 
Officer Sanchez testified that Appellant was wearing a dark blue
long-sleeved shirt and black jeans. 
Officer Nelms, however, testified that Appellant was wearing a blue polo
shirt, which was consistent with admitted photographs of Appellant at the
police station later that night.  The
officers observed that Appellant was slightly out of breath, appeared nervous,
and was sweating, even though it was cold outside that night.  The officers also noticed that Appellant=s shirt was dirty and that he had grass
in his hair.

After the officers
made contact with Appellant, he was transported to the scene to see if Officer
Jordan could identify him.  Officer
Jordan was unable to identify Appellant as one of the suspects.  On cross-examination, Officer Sanchez agreed
that Appellant was not wearing a hooded sweatshirt and he described Appellant
as having a Amedium@ build.








Detective Jesus
Pantoja, Jr. met with Appellant at the scene. 
Appellant agreed to go to the police station and discuss the case with
the detective.  At the station, Detective
Pantoja observed Afresh@ scratches on Appellant=s arms and legs.  During the voluntary interview, Appellant
told the detective that around 8 a.m. that day, he left his sister=s house on Pink Coral and went to his
other sister=s house
on Tejas.  During his stay, he ate
breakfast there and then spent the day picking up some building materials and
cleaning her backyard, which was how he received his various injuries.  Around nightfall, Appellant walked to his
friend Augustine=s
house.  When he could not find Augustine,
he went three houses down on the same street to look for a female friend, whose
name he could not recall, but who he described as a heavyset Hispanic
female.  Appellant could not find this
female friend either.  Appellant was
walking around the area when he was approached by the officers.  Appellant was unable to provide the last name
or telephone number for Augustine, but did give directions to the house.  During Appellant=s
conversation with Detective Pantoja, Appellant denied ever being in the van
that was involved in the incident.

Detective Pantoja
contacted Appellant=s
sisters, Clementina Luevano and Patricia Coria. 
Detective Pantoja determined that the information that the sisters provided
was not consistent with what Appellant had said.  In addition, Detective Pantoja later
discovered that the directions Appellant had given led to a vacant house on
Clifton.  When officers went to the house
that was three houses down from that location, they encountered a Hispanic
female, but she did not know Appellant.








Officer Enrique
Ledesma of the crime scene unit was dispatched to the scene on February 24
and was assigned the duty of removing the narcotics from inside the van.  With assistance from two other detectives,
Officer Ledesma removed five Avery
large@ wrapped
bundles from the van, which each had dozens of smaller bundles inside.  Specifically, each bundle was a large duffel
bag wrapped in black electrical tape and each duffel bag contained over 100
smaller bundles, for a total of 697 smaller bundles.  Officer Ledesma recalled that when he entered
the van to remove the bundles, there was a slight odor of marijuana inside the
van.  Police toxicologist, Rafael Tamez,
tested representative samples from the bundles removed from the van and
determined that the substance in the bundles was marijuana.  The total weight of the marijuana in the
bundles was 1,053.85 pounds.

Officer Tom
Monday, a crime scene technician, processed the van for fingerprints on
February 25.  Officer Monday was able to
lift thirty-three latent prints from the interior of the van, two from the
exterior, and five prints from personal items inside the van.  Officer Monday did not know the age of the
prints that were left on and in the van. 
Bruce Orndorf, the El Paso Police Department=s
fingerprint examiner, compared the prints lifted from the van to Appellant=s fingerprints.  According to Mr. Orndorf, four of the
fifty-three latent prints from the van were made by Appellant.[2]  Specifically, prints numbers 3, 26, 29, and
30, matched Appellant=s
fingerprints, which respectively were one print from the interior wheel well in
the cargo area of the van and three prints from the interior ceiling of the
van.  Mr. Orndorf obtained a second
opinion from Officer Doug Lloyd, who confirmed the match.

Two of Appellant=s sisters testified on behalf of the
defense.  According to Patricia Coria, on
the day of the incident, Appellant arrived at her house on Tejas around 3 p.m.
and did some roofing work, helped clean up her yard, and watched television
with her sons before leaving the house at approximately 8 p.m.  Tina Luevano, Appellant=s other sister, testified that
Appellant and her brothers cleaned up Patricia Coria=s
yard, and off and on, did roofing work during that winter.








In rebuttal,
Detective Pantoja testified that when he spoke to Patricia Coria, she told him
that Appellant arrived at her house about an hour or two before sunset, had
dinner, and then watched television. 
Detective Pantoja asked her if Appellant had done any type of yard work
at her house and she said no.  He did not
recall her telling him anything about Appellant moving roofing materials for
her or cleaning up construction equipment.

In Issue One,
Appellant challenges the legal sufficiency of the evidence to sustain his
conviction.  Specifically, Appellant
contends that the State failed to prove that he was in possession of the
contraband because there were insufficient affirmative links connecting him to
it.

Standard
of Review








In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Hernandez
v. State, 946 S.W.2d 108, 110-11 (Tex.App.--El Paso 1997, no pet.).  The standard is the same for both direct and
circumstantial evidence cases.  King
v. State, 895 S.W.2d 701, 703 (Tex.Crim.App. 1995).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is to determine whether if
both the explicit and implicit findings of the trier of fact are rational by
viewing all the evidence admitted at trial in the light most favorable to the
verdict.  See Adelman, 828 S.W.2d
at 421-22.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.

Possession
of a Controlled Substance

A person commits
the offense of possession of marijuana if he knowingly or intentionally
possesses a usable quantity of marihuana. 
See Tex.Health &
Safety Code Ann. '
481.121 (Vernon 2003).  The offense is a
second degree felony if the amount possessed is 2,000 pounds or less but more
than 50 pounds.  Id. at ' 481.121(b)(5).  Possession is defined as Aactual care, custody, control, or
management.@  Tex.Health
& Safety Code Ann. '
481.002(38)(Vernon Supp. 2005).  To
support a conviction for unlawful possession of a controlled substance, the
State must prove that the accused (1) exercised actual care, custody, control,
and management over the contraband, and (2) the accused knew the substance he
possessed was contraband.  See Brown
v. State, 911 S.W.2d 744, 747 (Tex.Crim.App. 1995); Menchaca v. State,
901 S.W.2d 640, 651 (Tex.App.--El Paso 1995, pet. ref=d).  Knowledge may be inferred from the
circumstances.  Linton v. State,
15 S.W.3d 615, 618 (Tex.App.--Houston [14th Dist.] 2000, pet. ref=d).

When the defendant
is not in exclusive possession or control of the place where the contraband is
found, the State must prove additional independent facts and circumstances
affirmatively linking him to the contraband. 
Poindexter v. State, 153 S.W.3d 402, 406 (Tex.Crim.App.
2005).  An affirmative link generates a
reasonable inference that the accused knew of the contraband=s existence and exercised control over
it.  See Brown, 911 S.W.2d
at 747; Menchaca, 901 S.W.2d at 651. 
By either direct or circumstantial evidence, the State Amust establish, to the requisite level
of confidence, that the accused=s
connection with the drug was more than just fortuitous.@  Brown, 911 S.W.2d at 747.








Affirmative links
connecting a defendant to the contraband may include the following:  (1) the contraband was in plain view; (2) the
contraband was conveniently accessible to the accused; (3) the accused was the
owner of the place where the contraband was found; (4) the accused was the
driver of the automobile in which the contraband was found; (5) the contraband
was found on the same side of the car seat as the accused was sitting; (6) the
place where the contraband was found was enclosed; (7) the contraband emitted a
strong odor; (8) paraphernalia to use the contraband was in view of or found on
the accused; (9) conduct by the accused indicated a consciousness of guilt;
(10) the accused had a special connection to the contraband; (11) occupants of
the automobile gave conflicting statements about relevant matters; (12) the
physical condition of the accused was compatible with recent consumption of the
contraband found in the car; (13) traces of the contraband were found on the
accused; (14) affirmative statements connect the accused to the contraband;
(15) the accused possessed other contraband when arrested; and (16) the amount
of contraband found.  See Lassaint
v. State, 79 S.W.3d 736, 740-41 (Tex.App.--Corpus Christi 2002, no pet.); Nguyen
v. State, 54 S.W.3d 49, 53 (Tex.App.--Texarkana 2001, pet. ref=d); Jones v. State, 963 S.W.2d
826, 830 (Tex.App.--Texarkana 1998, pet. ref=d);
De La Paz v. State, 901 S.W.2d 571, 583-84 (Tex.App.--El Paso 1995, pet.
ref=d). 
There is no set formula of facts necessary to support an inference of
knowing possession.  Hyett v. State,
58 S.W.3d 826, 830 (Tex.App.--Houston [14th Dist.] 2001, pet. ref=d). 
Moreover, the number of factors present is less important than the
logical force the factors have in establishing the elements of the
offense.  Hurtado v. State, 881
S.W.2d 738, 743 (Tex.App.--Houston [1st Dist.] 1994, pet. ref=d).

 








Appellant argues
that there were no affirmative links between him and the marijuana to establish
the essential elements of knowledge and control.  The evidence, however, showed that Appellant=s fingerprints were in the van, despite
Appellant=s
statement that he had never been inside the van.  The jury could have reasonably concluded that
Appellant left his fingerprints in the van while he was involved in the
incident even though the State=s
witness could not determine the age of the prints.  As an occupant, the large quantity of
marijuana would have been in plain view and easily accessible to
Appellant.  Other circumstantial evidence
also supports Appellant=s
connection to the contraband.  Appellant
was located four to six blocks from the van during the police officers= canvassing of the area.  He was wearing dark clothing that generally
matched the description of the clothes worn by the van=s
occupants.  Appellant=s clothes were dirty, grass was in his
hair, and he had fresh scratches on his arms and legs, as if he had been
fleeing through a desert area.  Appellant
was also sweating and out of breath, even though it was cold outside,
suggesting that he had been running or was being chased before the officers
made contact with him.  Fleeing from the
van would be indicative of Appellant having a consciousness of guilt.  We conclude that a rational trier of fact could
have found beyond a reasonable doubt that Appellant exercised care, custody,
control, and management over the contraband and that Appellant knew the
substance possessed was contraband, thus the evidence was legally sufficient to
support Appellant=s
conviction.  Issue One is overruled.

In Issue Two,
Appellant contends that the trial court erred in allowing the State to seek an
enhanced punishment.  Specifically,
Appellant asserts that the trial court erred in overruling his objection to the
State=s notice
of enhancement and habitualization because it was not timely.

 








Appellant was
indicted in this case on November 18, 2003. 
The indictment alleged a prior felony conviction, engaging in organized
criminal activity, for enhancement purposes. 
On June 7, 2004, the State filed a notice of extraneous offense, which
listed in addition to the prior conviction alleged in the indictment, five
additional felony convictions, as well as several misdemeanor convictions and
other unadjudicated offenses.  The
following day, the State filed a separate notice of enhancement and
habitualization, giving Appellant notice of its intent to seek an enhancement
and habitualization of the punishment range due to Appellant=s six prior felony convictions.  Appellant=s
trial began on June 14, 2004, at which time he objected to the timeliness of
the State=s
enhancement and habitualization notice. 
Appellant did not request additional time to prepare for trial, but
rather requested that the enhancement and habitualization paragraphs be
quashed.  In fact, Appellant
affirmatively waived any additional time. 
At the punishment phase of trial, Appellant=s
counsel challenged the fingerprint expert=s
conclusions in his fingerprint comparisons, but when the State offered the
certified copies of the pen packets for the six alleged prior felony
convictions into evidence, Appellant=s
counsel affirmatively stated, Ano
objection.@








A defendant is
entitled to notice of prior conviction to be used for enhancement.  Brooks v. State, 957 S.W.2d 30, 33
(Tex.Crim.App. 1997).  The purpose of an
enhancement allegation is to provide the accused with notice of the prior
conviction relied upon by the State.  Coleman
v. State, 577 S.W.2d 486, 488 (Tex.Crim.App. 1979).  A proper notice of intent to enhance
punishment must be given in a timely manner, but it need not be pled in the
indictment itself to be considered proper notice, so long as it is pleaded Ain some form@
prior to trial.  Brooks, 957
S.W.2d at 34.  Proper notice advises the
accused Athat a
greater penalty is to be sought than for a first offense, and to enable him to
take issue thereon, and if possible show there is a mistake in identity, or
that there was no final former conviction or the like.@  Hollins v. State, 571 S.W.2d 873, 876
(Tex.Crim.App. 1978), quoting Palmer v. State, 128 Tex.Crim.R.
293, 81 S.W.2d 76, 79 (1934).

With regard to the
timeliness of the notice, the Texas Court of Criminal Appeals has recently held
that the Brooks notice requirement is of constitutional origin and that
the ultimate question is whether constitutionally adequate notice was
given.  Villescas v. State, --
S.W.3d --, 2006 WL 861008 at *3 (Tex.Crim.App. Apr. 5, 2006).  Thus, for due process purposes, the
determination of whether proper notice was given does not require that the notice
be given within a particular time period either before trial or even before the
guilt phase of trial.  Id.; cf.
Sears v. State, 91 S.W.3d 451, 455 (Tex.App.--Beaumont 2002, no
pet.)(ten-day notice before trial of enhancement notice is presumptively reasonable);
see also Fairrow v. State, 112 S.W.3d 288, 295 (Tex.App.--Dallas 2003,
no pet.)(same).








In determining
whether Appellant was provided sufficient notice in this case, we note that
there is nothing in the record to suggest that Appellant=s
defense was in any way impaired by the timing of the State=s enhancement and habitualization
notice.  In fact, Appellant did not claim
that he was unprepared to defend against the prior conviction and instead,
affirmatively waived any additional time to prepare in response to the trial
court=s inquiry
before trial.  At the punishment phase of
trial, Appellant=s counsel
affirmatively stated, Ano
objection@ when the
pen packets for the prior convictions were offered into evidence.  We note that Appellant did request a
continuance at the punishment phase, but his request was unrelated to the
enhancement notice issue.  After
considering these facts and circumstances, we conclude that Appellant was given
sufficient notice of the enhancement and habitualization allegations, and thus
the State=s notice
was timely.  Issue Two is overruled.

We affirm the
trial court=s
judgment.

 

 

May
18, 2006

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
The Border Patrol Agent, Waldy Velez, did not testify before the jury but did
testify in a telephonic voir dire examination outside of the jury=s presence, explaining his involvement
in the  incident that night.  His testimony, however, was never presented to
the jury.





[2]
In addition to the forty latent prints Officer Monday lifted from the van,
thirteen additional prints were lifted from the marijuana bundles and packaging
materials.